COMMONWEALTH *vs.* WILLIAM J. EDGERTON.

Bristol.    October 26, 1908. — January 4, 1909.

Present: KNOWLTON, C. J., MORTON, LORING, SHELDON, & RUGG, JJ.

*Elections. False Counting and Reporting of Votes. Evidence. Jury and Jurors. Practice, Criminal,* Separation of jurors, New trial.

At the trial of an indictment under St. 1907, c. 560, § 410, against an election officer for wilfully performing contrary to law the duties imposed upon him by § 270 of the same chapter in making a false count of votes in an election and knowingly making a false report of the result of the canvass and count of votes, the official tally sheets kept by the defendant in the counting of the votes are competent and are the best evidence to show what the count kept by the defendant was.

At the trial of an indictment under St. 1907, c. 560, § 410, against an election officer for wilfully performing contrary to law the duties imposed upon him by § 270 of the same chapter in making a false count of votes in an election and know-

ingly making a false report of the result of the canvass and count of votes, the testimony of bystanders, who observed the defendant's conduct in keeping a false tally of the votes, is admissible to show the facts which they observed although they were not election officers and were interested in the election only as citizens.

At the trial of an indictment under St. 1907, c. 560, § 410, against an election officer for wilfully performing contrary to law the duties imposed upon him by § 270 of the same chapter in making a false count of votes in an election and knowingly making a false report of the result of the canvass and count of votes, the Commonwealth, against the objection of the defendant, introduced the testimony of the registrars of voters to show that upon a recount by them it appeared that the ballots had not been counted and reported correctly, and the jury were allowed to inspect the sheets used by the registrars at the recount and used by them in testifying to refresh their recollections, the jury being instructed that those sheets were not evidence and could not be considered by them. The defendant contended that instead of this testimony the ballots themselves, being the best evidence, should have been produced for the jury to count. *Held*, that, assuming that the production of the ballots could have been compelled, which was doubted, there being no question raised as to any irregularities appearing on the face of the ballots, the number of the ballots cast on one side and the other was a matter of computation, and that the computation could be testified to by any one who made it, and therefore, that the registrars, refreshing their recollections by referring to the sheets used by them at the recount, properly could testify as to the result of the recount so far as it related to the count and report made by the defendant, and that the jury properly were allowed to inspect the sheets for the purpose of assisting them in passing upon the credibility of the registrars.

At the trial of an indictment under St. 1907, c. 560, § 410, against an election officer for wilfully performing contrary to law the duties imposed upon him by § 270 of the same chapter in making a false count of votes upon the question of the granting of licenses for the sale of intoxicating liquors in a city and in knowingly making a false report of the result of the canvass, there was evidence that the defendant made marks on a tally sheet as another election officer called off the answers on the ballots, for the purpose of keeping an account of the votes, that in doing so he marked twenty-one more votes for license, fifteen less votes against license and six less blanks than the other election officer called off to him and than afterwards appeared to be the true numbers upon a recount by the registrars of voters, and also that, when the defendant became aware that two bystanders were following the count, he kept the tally correctly. There was other evidence from which guilty knowledge on the part of the defendant could have been inferred. It further appeared that the defendant and the election officer who called off the answers to him signed the tally sheets thus marked by the defendant, and that these tally sheets were delivered to and received by those charged with the duty of declaring the results of the election as the reports of the results of the votes counted and canvassed by the defendant and the other election officer who signed them. *Held*, that there was evidence for the jury that the defendant wilfully made a false count and knowingly made a false report of the canvass of votes, that the count and canvass by the defendant and the election officer who called off the answers were none the less a count and canvass by the defendant because he merely marked the tally sheets while the other handled the ballots, and that the tally sheets signed by the two constituted and were intended to constitute reports of the results of the votes counted by them.

At the trial of a criminal case the jury retired to consider their verdict at about

eleven o'clock in the morning. They all were taken to a midday dinner. At about seven o'clock in the evening the officer in charge of the jury asked them whether they cared for supper, and, upon being told that they did, made preparations accordingly. One juryman said that he did not feel well and did not care for supper and would stay and smoke. The other jurors were taken to supper by the officer and this juryman was left in the jury room, which was locked and remained locked until the rest of the jury returned. The jury deliberated all night, and did not reach a verdict until after breakfast the next morning, at about ten o'clock. When the jury were taken out to supper the court had adjourned, and therefore the matter of leaving the juror alone in the jury room was not brought to the attention of the judge at that time. The jury returned a verdict of guilty, and the defendant filed a motion for a new trial on the ground that the jury had been allowed to separate after the case had been submitted to them and before they had arrived at their verdict. The judge denied the motion, and in doing so found as matter of fact that the officer and the juror acted in good faith and that the reasons which the juror gave for not wanting to go to supper were true ; that the juror remained locked in the jury room alone all the time the other jurors were absent ; that he saw no one and spoke to no one ; and that nothing occurred during their absence to influence his mind in arriving at a verdict. The judge also found that there was no talk among the other jurors at the supper table in regard to the case, and that, even if some of the jurors did talk about the case in going from and returning to the court house, what was said was of a casual and informal nature and could not reasonably be considered a part of the deliberations of the jury. He also found that, although the juror might have heard and might have been influenced by the remarks made by some of the jurors if he had been with them in going to and returning from supper, the matter was too unsubstantial to justify setting aside the verdict, and that the facts did not show a reasonable probability that the rights of the defendant had been violated. The judge ruled as matter of law that on the facts found by him the defendant was not entitled to a new trial, and denied the motion as a matter of discretion. *Held,* that it could not be said as matter of law that there was any error in the rulings or the findings of the judge.

MORTON, J. This was an indictment in two counts under St. 1907, c. 560, §§ 270, 410, charging the defendant with wilfully performing his duty as an election officer contrary to law by knowingly making a false count of votes on the license question, and by knowingly making a false report of the result of a canvass of votes on said question at the municipal election for the city of New Bedford, held December 3, 1907.

There was a verdict of guilty on each count, and the case is here on exceptions by the defendant to the refusal of the judge *
to direct a verdict for the defendant, and to the refusal of the judge to give other rulings requested by the defendant; also to the admission of evidence, and to the findings of fact and rulings

---

* *Schofield,* J.

of law made upon a motion for a new trial, which was filed by the defendant.

It appeared that the defendant was duly appointed an election officer and acted as such at the election in question in Precinct 9 of Ward 3, and that he was assigned by the warden or presiding officer to work with one Jennings in canvassing and counting the ballots which were cast in that precinct. It also appeared that after the polls were closed the ballots were taken from the ballot box and arranged by the election officers, of whom, including the defendant, there were six, in blocks or packages of fifty ballots each. There was testimony tending to show that in canvassing and counting the ballots the course pursued by Jennings and the defendant was as follows : Jennings would take a block of ballots and call off from each ballot the names of the persons voted for, and "yes" or "no" or "blank" according as the license question was answered "yes" or "no," or not at all, and the defendant would make a mark upon a tally sheet under the name of the person voted for and against the word "yes" or "no" or "blank," according to the announcement made by Jennings. There was a tally sheet for each block or part of a block. After a block had been thus canvassed and counted the defendant would slide the tally sheet over to Jennings, who would announce the totals, and the defendant would enter the figures thus given in a column headed "totals" at the right of the tally sheet. The tally sheet was then signed by Jennings and the defendant and folded up and placed with the ballots in the envelope from which the latter had been taken, and afterwards the totals on each tally sheet were entered by the clerk on a sheet called the total vote sheet. After the ballots had all been counted they were placed in a box which was sealed up and sent with the tally sheets, total vote sheets, a book called the precinct book containing the result of the votes cast in the precinct as ascertained by the election officers, the check lists, unused ballots and ballot box, to the city clerk. After the election there was a recount of the ballots by the registrars of voters on the license question, and the results of their count of blocks 3, 5 and 6 differed materially from the results of the counts of those blocks as shown by the tally sheets kept by the defendant. These blocks and block 9 were specified

by the district attorney, in answer to the defendant's motion for a bill of particulars, as those in regard to which the alleged false count and report were made by the defendant. There was also other evidence tending to show that the defendant's count of these blocks was not correct. All of the other election officers were summoned by and testified as witnesses for the Commonwealth. The defendant was a witness in his own behalf.

1. The city clerk was called as a witness by the district attorney, and produced the tally sheets, twelve in number, used by the election officers in the precinct, on the day of election, and they were offered in evidence by the district attorney, and were admitted, subject to the defendant's objection and exception that they were not competent to prove the charges contained in the indictment and specifications. It was part of the Commonwealth's case to show, if it could, that the count and report made by the defendant were wrong. In order to do that it was necessary to show what the count and report made by the defendant were. The tally sheets kept by him of the blocks specified were the best evidence of the count and report made by him of the ballots contained in those blocks, and were plainly competent. No objection was made to the admission of the tally sheets on the ground that they included tally sheets kept by other officers. If there had been, no doubt such other tally sheets would have been excluded. Moreover the judge carefully instructed the jury that any acts or irregularities in which the defendant took no part should have no effect against him, and the jury must be presumed to have followed the instruction thus given.

2. The testimony of the bystanders Garside and Cram * was

---

* Garside was a reporter for the New Bedford Standard, a daily newspaper, and Cram was a reporter for the New Bedford Times, another daily paper. They were standing outside the rail and kept count of the license vote as Jennings called it off. Among other things, Garside testified as follows:

" I kept a count in my note book of block 3. I made it 22 yes and 22 no and did not count blanks. Edgerton made 30 yes and 19 no and 1 blank. I looked then to see which was first the yes or the no, and I spoke to Cram. I counted the next block as follows — 20 yes, 25 no and 5 blanks. I asked Edgerton what he made and he said that he had 28 yes, 17 no, 5 blanks. I counted block 6 and saw Cram count also, that was the block on which there

plainly admissible on the issue whether the defendant wrongly counted and reported the ballots counted and reported by him. The fact that they were not election officers and were interested in the election only as citizens did not render their testimony as to what they observed in regard to the defendant's conduct inadmissible.

3. The testimony of the registrars of voters in regard to the recount was also plainly admissible on the question whether the ballots had been correctly counted and canvassed. The defendant contends that the ballots themselves should have been produced for the jury to count as the best evidence. It may be doubted whether their production could have been compelled. But, however that may be, the question was whether the tally kept by the defendant was a correct tally or count, and any one who had counted the ballots or who had followed the count or tally kept by another could testify thereto, as to any other competent fact within his own observation. While in a sense the ballots themselves were the best evidence of the number cast pro and con on the license question, they were not from the nature of the case the only evidence. The number was a matter of computation and the computation could be testified to by any one who made it. No question was raised, so far as appears, as to whether any of the ballots had or had not been properly counted by reason of any irregularities appearing upon the face thereof. The registrars were properly allowed to refresh their recollection by referring to the sheets used by them at the recount, and the jury were properly allowed to inspect the sheets for the purpose of assisting them in passing

---

was a misunderstanding between Jennings and Edgerton. I did not find out whether the disputed ballot was a 'blank' or a 'no.' I made the count 19 yes, 29 no and 1 blank, having one uncertain. On the next block Cram stood at the rail marking down, we counted the same as Edgerton. On the next block I counted the no votes in my head and Cram counted the noes also. Our count was the same as Edgerton."

In cross-examination Garside further testified, " I did not keep the last count in the book because I thought mistakes might continue to be made if they did not know they were being watched. I reasoned that way as soon as it became evident that no mistakes were made on one block when Cram stood at the rail taking counts. There was every appearance of intentional wrong count. I came to that conclusion after three blocks had been counted."

upon the credibility of the registrars. The jury were expressly instructed that the sheets thus used by the registrars to refresh their recollection were not evidence and could not be considered by them. The fact that the defendant had no notice of and was not present at the recount was immaterial. The statute contains no provision for such notice in a case like the present. St. 1907, c. 560, § 300. Neither was the fact that certain requirements of the statute were not observed at the recount material. The legality or illegality of the recount was not in issue; and the failure to observe the statutory requirements which it was contended were not observed was not shown and could not have been found to have affected the correctness of the recount.

4. The defendant asked the judge to instruct the jury that there was no evidence that he counted any votes, or knowingly and wilfully made a false count, or knowingly made a false report of any count or canvass of votes. The judge refused to do so and the defendant excepted. Full instructions were given to which no objection was made except to the refusal to give the above instructions. We think that the presiding judge was right in refusing to give the instructions requested. It could not have been ruled that there was no evidence that the defendant counted any votes or made a report of a count and canvass. He made marks on the tally sheet as Jennings called off the answers, for the purpose of keeping an account of the votes, and the jury were warranted in finding that this constituted a counting and canvassing of the votes by him. It was not necessary that he should handle each ballot in order to count and canvass the votes. The count and canvass was none the less a count and canvass by the defendant because made by Jennings and himself, each assisting the other, Jennings handling the ballots and the defendant keeping the count. The jury were also warranted in finding that the tally sheets signed by Jennings and the defendant constituted and were intended to constitute reports of the results of the votes counted and canvassed by them and were so regarded by those charged with the duty of declaring the results of the election. There was also evidence warranting the jury in finding that the defendant wilfully and knowingly made a false count and canvass and a false report of the votes

counted and canvassed by him. There was testimony tending to show that in blocks 3, 5 and 6 there was an error of forty-two votes, — the recount showing twenty-one less votes in favor of license, fifteen more against it, and six more blanks. The total number of ballots in these three blocks was one hundred and fifty. Jennings was a witness for the Commonwealth and testified in substance that he called off the votes correctly. The whole number of votes in the city on the license question was upwards of eight thousand. The majority for license on the original count of the whole vote was one hundred and eighty. On the recount this was reduced to ninety-three. Of the eighty-seven votes thus shown to have been wrongly counted for license, thirty-eight or almost one half, were shown or could be found to have been shown to be in the three blocks of ballots of fifty each, counted and canvassed by the defendant. This warranted the jury in finding either that he was grossly incompetent or that the errors were committed by him wilfully and knowingly. There was also evidence tending to show that, after he became aware that Garside and Cram were following the count, the defendant kept the tally correctly. There was likewise evidence of conversations with and statements made by the defendant which the jury may have thought more consistent with guilty knowledge on his part than with any other reasonable explanation. The rulings requested by the defendant could not therefore have been properly given.

5. The jury retired to deliberate upon their verdict about eleven o'clock. They were all taken to dinner. About seven o'clock in the evening the officer in charge of them asked if they cared for supper, and, upon being told that they did, made preparations accordingly. One juryman said that he did not feel well and did not care for supper and would stay and smoke. The other jurors were taken to supper by the officer and this juryman was left in the jury room, which was locked and the key was left outside near the door, in its accustomed place. When the jury returned the juror was found in the jury room with the door locked. The jury deliberated all night and did not reach a verdict until after breakfast about ten o'clock the next morning. The court had adjourned when the jury were taken out to supper, and the matter of leaving the juror alone

in the jury room was not therefore brought to the attention of the judge at that time. After the verdict was rendered the defendant filed a motion for a new trial, one ground of which was that the jury had been allowed to separate after the case had been submitted to them and before they had arrived at their verdict. The judge denied the motion and the defendant excepted thereto. The decision of the presiding judge is not open to revision here unless there was as matter of law some error in his rulings or findings. *Nichols* v. *Nichols*, 136 Mass. 256. He found as matter of fact that the officer and the juror acted in good faith and that the reasons which the juror gave for not wanting to go to supper were true; that he remained locked in the jury room alone all the time the other jurors were absent, saw no one and spoke to no one; and nothing occurred during their absence to influence his mind in arriving at a verdict. The judge also found that there was no talk between the other jurors at the supper table in regard to the case, and that, even if some of the jurors did talk about the case in going from and returning to the court house, what was said was of a casual and informal nature and could not reasonably be considered as a part of the deliberations of the jury; and he found that, although the juror might have heard and have been influenced by the remarks made by some of the jurors in going to and returning from supper, the argument was too unsubstantial to justify setting aside the verdict, and the facts did not show a reasonable probability that the rights of the defendant had been violated. He ruled as matter of law that, on the facts found by him, the defendant was not entitled to a new trial, and he refused to allow the motion as a matter of discretion. We do not see how it can be said as matter of law that there was any error in his rulings or findings. The only difference between this case and *Commonwealth* v. *Gagle*, 147 Mass. 576, is that in that case the juror was permitted by the court to remain in the jury room under the charge of an officer. But if what took place in that case did not constitute as matter of law such a separation as to prejudice the rights of the defendant, we do not see how what took place here can be held as matter of law to have constituted such a separation. See also *Nichols* v. *Nichols*, 136 Mass. 256. Sound public policy requires that the safeguards which have been es-

tablished to insure verdicts free from all improper influences should be strictly maintained; but as was said in *Nichols* v. *Nichols,* the court "ought not to be swift to grant a new trial on account of irregularities not attended with any intentional wrong, and where it is made satisfactorily to appear that the party complaining has not and could not have sustained any injury from them."

*Exceptions overruled.*

*J. Walsh,* for the defendant.

*J. M. Swift,* District Attorney, (*F. B. Fox,* Assistant District Attorney with him,) for the Commonwealth.